May it please the Court, my name is Laurel Sidoway, I represent the City of Spokane. Prudential Securities, now Prudential Equity Group, underwrote and sold over $31 million worth of bonds for the Spokane Downtown Foundation, landing Prudential, the City, and others in expensive securities fraud litigation below. The City paid $29.8 million to settle with a view to looking to Prudential and other financing participants for contribution. But it had collected only $9.9 million towards its $29.8 million settlement cost when, in March 2005, the District Court dismissed the City's claim, contribution claim against Prudential, based on a determination by the District Court that the City had recovered all of the contribution damages it would be able to recover. The City was, therefore, lost its opportunity to seek collection from Prudential, the underwriter, the party principally responsible for the due diligence and disclosure, and lost any opportunity to recover anything more towards its remaining $20 million settlement cost. This morning I will address the three significant errors that the District Court made  But first, because the order of events below was confusing and there are a handful of events that are important, I want to walk through a very limited timeline of some of the most significant events that happened in the trial court between April 2004, when the City settled, and the March 2005 hearing at which the District Court dismissed the City's contribution claim. The first important event is the City's settlement itself. In April 2004, the settlement agreement had been fully executed, signed, and was filed in the court in early May 2004. It appears in the record, in our excerpts of record, at page 2,000 or 1,000 and following. It's important because it defines the settlement payment that the City required to make, and it makes clear the undisputed fact that the City's settlement cost was $29.8 million. Well, stop, because here we're getting right to the heart of the question. When you say settlement cost, you mean something, the cost is something more than a resolution of the claims that were before the court in this lawsuit. Isn't that correct? No, Your Honor. I would submit, and I think the evidence shows, that the $29.8 is what it cost to settle the claims that were in the lawsuit. But let's suppose I've got a lawsuit with my next-door neighbor, and he says, the only way you're going to resolve, over the boundary line, the only way you're going to resolve this lawsuit is to buy me out completely. Buy my house, buy my tennis court, buy the swimming pool, buy the mansion I've got sitting on this property. You can't buy two square feet, you've got to buy the whole thing. And I do that. Does that mean that I've settled the case for $15 million so I could get a few square feet of property? Or did I get something a whole lot more than that for the few square feet of property? I would agree with you, Your Honor, that ---- In this case, the city redeemed all the bonds. They got all the bonds, including the bonds owned by those that were not plaintiffs in the lawsuit. So to say that $29 million was paid to settle the lawsuit, it may not have been possible to settle the lawsuit any other way, but I have a hard time with the notion that $29 million is what you paid for the settlement. But, Your Honor ---- More than the settlement. Your Honor, the cap, though, there that protects the defendant, the contribution defendant, is the fact that they'll never be exposed to more than the liability of the defendant's collective ---- I understand defendant maybe got a bonanza, but you must acknowledge, do you not, that the $29 million went for a lot more than settlement of the pending claims? I will grant you that the city derived other benefits and that other individuals were paid off pursuant to the bond plaintiff's agreement in a joint prosecution agreement that they would share their recovery. And let me refocus the question this way. Is there any authority that you can offer up that says that a theory of contribution permits you to recover for the extra things you got, for settlement of the claims that had not been but theoretically possibly could be someday brought? If you can demonstrate that those damages were a viable, recoverable claim. Bear in mind that I'm not suggesting ---- I'm waiting to find out what the authority is. So give your qualifications, but also point me to the authority, because quite frankly, I haven't found it. I haven't found it in your brief, and I haven't found anything I've read so far. Well, let me cite you to the Washington Supreme Court's decision in Moen v. Island Steel Erectors. That is a case that was written by Justice Phil Talmadge, who in a prior life had been Senator Phil Talmadge, who is the primary author of tort reform in the State of Washington. And in that case, one of the things that Judge Talmadge ---- Justice Talmadge discusses is the fact that it's an indemnification case, but he analogizes it to contribution. He says the reason that you don't need to have a reasonableness hearing in a case like this, in a case like the cities, is because your indemnification trial forces you to prove the liability to which the defendants were exposed. He discusses Washington's actual liability rule. And the actual liability rule requires somebody in the city's position to, in order to recover, we have to go to trial against parties like Prudential, and we have to prove the magnitude of the plaintiff's claims. We have to prove the rescission remedy that the bondholders would be entitled to recover. We have to prove AGIC's damages. And we never recover more than we prove. If we can only prove damages of $24 million and we paid $29 million, Justice Talmadge says that trial satisfies, protects the defendant against the sweetheart deal, because you'll never recover more than the liability to which you've demonstrated they were exposed. But does that say that the liability you're allowed to demonstrate is liability in excess of the plaintiffs in the present lawsuit? I mean, I think that's the question here. Can you get contribution for something that isn't before the court at that time? Yes. The both common law contribution and the statute-defining contribution says that the contribution right arises because you have discharged a liability to which you and other parties were exposed. And there are lots of ways that that can arise. For instance, in the Cotler case, a Washington Supreme Court case, there were one case that hadn't even been brought. No lawsuit had been filed. And yet one of the defendants satisfied the liability and wanted to proceed to trial and demonstrate the liability to which the parties were exposed. So, yes, sometimes the claims that are discharged are already existing in a lawsuit. Sometimes they're not. In the case of the Citi's contribution claim, it was seeking to recover liabilities that had been before Judge Shea in the original April 2004 trial and others. Well, I want to ask you. Can we stop? Yes. Let me just have Judge Schwarzer go first, and then I have some questions as well. Liabilities before Judge Shea in the upcoming trial, those liabilities were what the claims made by bondholders, but they did not include any claims on behalf of people that bought the bonds on the market and were not within the class of plaintiffs. And that's included in the settlement. So the settlement includes claims that are not before the court and not within the scope of liability. It does. And that was an accident of the joint prosecution agreement that had been entered into back in 2001. An accident? Well, it was a natural result, I suppose, a natural result of an agreement that had been made by those other parties. You had the mutual funds who wanted the trustee to fund their attorneys' fees on an ongoing basis out of trust assets, out of trust reserves. And so they all entered into an agreement, and we included it in the appendix to our reply brief. Everybody was aware of it. It was a trial exhibit that everybody was going to use. Everyone had stipulated to its authenticity. That joint prosecution agreement said, the bond funds said, if you will fund our attorneys' fees on an ongoing basis, then we, who have the strongest claims, promise that if we recover, we will share our recovery with all of the bondholders, insured and uninsured. That was their deal, and that was the context in which we had to negotiate the settlement, as was discussed in hearings with Judge Shea and with other counsel. That was the plaintiff's demand. It's laid out in our complaint. That's what we had to deal with. But the thing that protects Prudential is that we never said we automatically get to recover whatever we paid to these plaintiffs pursuant to their understanding that they were going to share. We only said, give us a chance to go to trial and prove our damages, prove the damages that we can prove against Prudential. We're not asking for anything more than that. Maybe we won't prove 25 million in damages. Maybe we won't prove 41 million. Maybe we'll only prove 16 million. But all we were asking Judge Shea for is the opportunity to go to trial and prove that claim, and it is that actual liability requirement, the fact that we're going to have to try that case that Justice Talmadge says protects parties like Prudential. Prudential can't complain about the fact that we found ourselves negotiating in the context of this joint prosecution agreement. They'll never have to pay anything more than what we're able to prove at trial, and I'm not suggesting that they would. I'm not sure how this trial is going to permit you to prove claims that aren't there. How would that go? How would that come about? Well, and the claims that we're seeking to prove, I handed up some documents from the excerpts of record that I wanted to refer to. The first document I wanted to draw the Court's attention to is the actual motion to cap damages itself, because that's the motion that Prudential believes the trial judge was, district court judge was addressing in the March 2005 hearing. And I just wanted to point out that throughout the history of the briefing of that motion, the non-settling defendants always said, and we always agreed, that the starting point for that cap is the maximum damages that the plaintiffs had and that they faced at trial. That's the starting point. Sometime between November 2004 and May, excuse me, March 2005, Prudential changed its mind, but consistently through the briefing that was filed in 2004, everybody agreed the starting point is going to be the maximum damages. We disagreed about what that meant with respect to AGIC. But as you'll see from their own motion, they said, and we agreed, that when it comes to the bondholders who are plaintiffs in the case, that maximum measure is their rescission remedy under the Washington State Securities Act. And under tab 2, which I've provided, and which was the key exhibit that Mr. Sillow for the city walked through during the March 10th hearing, that's exactly what we did. We tracked what they had said they wanted to do, what Prudential and others said they wanted to do. It was Prudential that reversed position and suggested a different starting number. And if you'll look at the columns that are under tab 2, the left-hand column abides by the district court's ruling late in 2004 that he was going to restrict AGIC's damages to 774,000. The right-hand column, we demonstrate to the district court what the damages could be if he doesn't impose that restriction. But other than that, on the top half of that exhibit on the left-hand side, we are doing exactly what Prudential and the others said needed to be done to determine the cap. We are working from Leslie Patton's numbers. He was the plaintiff's expert. These are the rescission damages under the Washington statute. The Washington statute mandates an award of attorney's fees. We put in declarations that that's the case. So it's the plaintiffs that are going to be the perpetrators, right, not just the plaintiffs? No. These are the rescission damages only for the plaintiffs that had claims. What number are you looking at? The first column, and it leads to a total of 27,300,000. And, Your Honor, the reason that's different from Prudential's number is because Prudential changed its position. They had originally said, let's take the plaintiffs who have claims against us who are going to go to trial and look at what their maximum recovery could be. And after Mr. Clyden did his work, they got more clever. They realized that given how the bondholders had agreed to share their damages, the plaintiffs who were in the case took a lot less than they were going to recover at trial so that they could share the balance with the other bondholders. All that the 18.3 million represents is the return of the bondholders' principal and a few payments at the 5.6 percent interest that hadn't been made. It doesn't give them the benefit of the statutory interest rate at 8 percent that goes back retroactive to 1998. It doesn't give them the benefit of the attorney's fees. They changed the rules of the game. They said we're not going to go with what those plaintiffs who are in the case who have claims can prove. We're going to go with the discount you negotiated because they agreed to share their recovery with somebody else. So the $27 million figure with which you start is the total of what was paid to bondholders, both plaintiffs and other bondholders, pursuant to the comprehensive or the global settlement agreement. Is that what you're saying? It's actually a little less. We paid 29 million, but consistent with my position earlier that what we paid isn't controlling. What's controlling is what people were exposed to. We're working off the numbers of what they were exposed to. And what they were exposed to if AGIC's damages are limited is $27 million. What we all were exposed to if AGIC's damages weren't limited is $41 million. And why do you say you were exposed to $27 million? Because this is the evidence that Les Patton was going to put on for the plaintiffs who were ready to go to trial in April 2004. This is what, if you look under tab 1, if you look at all of the materials that Prudential and everybody else filed all the way through 2004, this is the number they said was going to be the starting point. Prudential changed its mind. But that includes a lot of people who are not plaintiffs. No. It only includes the plaintiffs in the case. So the $27 million is only plaintiffs, not bondholders that aren't? It is only Nuveen, Smith, Barney. It's only the mutual funds and the handful of retail bondholders who still had viable claims and who are still in the case. We ignore everybody else. There's nobody in this figure. And, again, I refer you or refer your clerks to the record of the briefing, because this is the number Prudential was talking about and the others were talking about all through 2004 up until the time that Judge Shea ruled on the motion to cap in November 2004. Let me ask you another question. The number you start with, actually, is $19 million, identified as bond funds, WSSA. Now, what is bond funds? That would be the bond mutual funds like Nuveen and the Smith-Barney funds. That would include both plaintiffs who are bondholders and those who purchased previously on the market. It includes only bondholders who purchased pursuant to their preliminary official statement. Right. And that adds up to $19 million for those bonds. And the reason it's higher than the face amount of the bonds is because the Security And it's retroactive to when they bought the bonds. The coupon on these bonds was only 5.6 percent. So a big part of the damages we faced was this interest premium that would have been payable over the six-year life of the bonds and the attorney's fees as well. What's the face amount of these bonds? It was, I think in the case of the bond funds, it was about $16 million. And in the case of the retail bondholders, it was about $700,000. I'm going to have to address very quickly, I guess, the other errors. Well, we have you have a lot of assigned errors. So maybe you can spend your last two minutes on what you think is your next best argument, because we have a lot of briefing and we will we've gone through that. The most important errors are there was another $3.7 million swing because the trial court adjusted what it recognized was a legitimate bond value. It used in its oral decision, it said, I'm going to include an additive of 22 cents because the city went to court and questioned its liability. And the reason that was error is because if you look at the transcript of the March 10 hearing, fault was hotly contested. Prudential blamed the city. The city blamed Prudential. Everybody thought that that was going to be sorted out at trial. And what the trial court did in error, and it had no authority for doing it, is it cross-examination, without any evidence, assigning 100 percent of the problem to the city, none of the problem to anybody else, and without any evidence that suggested what the value of that problem was. The last swing was the AGIC damages. And, Your Honor, Prudential suggests that the standard of review, because we're talking about an order in limine, is abuse of discretion. But I think that depends on what you think Prudential was urging and Judge Shea was deciding. It almost sounded as though Prudential was trying to persuade Judge Shea that he should treat his order in limine against AGIC, not the city, as being preclusive to the city. In other words, because you decided it is a penalty to AGIC, you ought to as a matter of law, you have to carry it forward and apply it to the city. Well, there was no basis for doing that. There had been no final judgment. There was no collateral estoppel or res judicata effect. It was an order that could have been vacated or modified at any time. Shoot, the first time Judge Shea continued the trial date and the prejudice went away, there was no reason for penalizing anybody with that order in limine. But most important, the city never engaged in any culpable conduct. The city was straight up. From the day it signed the settlement agreement that created its rights of contribution, it spelled out what it thought the value of that claim was. Will it be able to prove it? Maybe not. But we're just saying give us the chance. We discharged those liabilities. Give us a chance to prove what their value was. Prudential will never have to pay more than we prove. The last thing I'd like you to reach, I realize you don't have to reach it, is the issue of reliance under the Washington State Securities Act. The reason it's important to us is because the reason it came up at all is Prudential Securities moved for summary judgment against Smith-Barney, which owns $7.2 million worth of these funds, because their documentary evidence of reliance was so slim. Well, the reason that Smith-Barney didn't do that is because Smith-Barney did not do that. Okay. Thank you. If it pleases the Court, my name is Rudy England. I'm from Lane Powell, appearing here today on behalf of Prudential. I think the Court has focused directly on a couple of the primary issues before it before just leaping into that immediately. I think it's important to remember that the focal point of why we're here is the order that Judge Shea entered on March 23, March 24 of 2005. And I think it is telling and it's consistent with some of the remarks of Judge Shea that this unique case, with little or no case law precedent for the respective positions, counsel have advocated seemingly imposing positions that reached dramatically different results. The result that Mr. or that Judge Shea, the district court, reached, we submit, was entirely the appropriate result and should be affirmed on appeal. And as this Court has already recognized, the $29.8 million settlement that was reached by the City of Seattle, by the City of Spokane rather, addressed a number of bond claims beyond the bond claims that were in the case. There were what I would characterize as four distinct procedural time frames that were involved in this litigation. The original many years were relating to the merits of the claims, but as of the time that the settlement was reached with Spokane in April, May of 2004, that changed the playing field. Ms. Sidway has referred to a changing position of prudential and will submit that if you look at the sequence of events as we go through them, we find that in the basic time frame of April through August of 2004, there was a period of time when the parties were trying to figure out exactly what the settlement meant. The parties, the court, the City of Spokane itself was trying to figure it out. They were deciding between remedies of pursuing subrogation as opposed to contribution, which they ultimately elected. We then moved into a phase of activities in the September to November time frame when the parties were getting more clarity on what does a contribution remedy mean. And then the real starting point, then, was the parties had basic agreement about motion practice, and there would have to be some form of a resolution for the court to figure out what kind of procedure could go forward. And in the excerpt of record at page 1175, this is an attachment to the Respondents non-settling defendants of which prudential was one of them, a motion for reconsideration on the motion to cap. And the motion to cap is what this case is all about. And the non-settling defendants, the prudential being the last one standing, which is why I'm here today, is they always took the position that there was a maximum amount that the city could recover. And, yes, indeed, the maximum amount that the city could recover as a starting point would be the amount of a claim that the city was asserting in the case. But underlying that, contribution is a function of what the settling party has settled for. And that's what the heart is that gets us to this $18.3 million number. And when you look at the record, the start of the courts realizing and figuring out in this very uncertain path because of the absence of real law, and that's why Ms. Siddeway cannot cite you a case for her proposition that she should somehow be able to recover something greatly beyond what is actually involved in settling the claims in the litigation, because you can't simply go out and finalize a contract and then say this is what I'm seeking and this is what I'm going to recover by way of contribution. And if we take it, her argument is that in order to settle the claims of the plaintiffs who had bond, who were holding bonds, she had to enter a disagreement. They had to enter a disagreement to cover the whole bond issue and retire all the bonds. That was the condition of the settlement. It wasn't a condition of the settlement. It was something that the city had to decide when it was going to decide whether or not it was going to settle. The city had all options that it wanted to, and it ultimately decided on a mechanism that would settle all of the bonds, both the bonds that were in the case and were out of the case. And that's totally apparent if you look at page excerpt of record 1010, which is a page from the initial settlement agreement that was filed with the court. The city shall pay an amount sufficient after application by the trustee of all revenues, reserves, and other trust funds then held under the indenture, net of accrued liabilities, and the amounts paid by all other settling defendants to equal the principle of all of the bonds outstanding and the interest accrued thereon as of the payment  So clearly, the settlement date is driven by the totality of the bonds. And you have the settlement date or the settlement amount then is for an amount far greater than any settlement value that can be attributed to the bonds in the case. And that is the key concept. But their argument, as I understand it, is the potential exposure. I mean, the reason that they basically wrapped it up in one package is that they have not only the bondholders in the case, but they have the other bondholders. And now they've basically nailed down any potential liability. Is that a fair statement of what they're doing? The fair statement of what they were doing, Your Honor, is that there were a number of political considerations that were going on in the City of Seattle. They had to do with the parking meter funds. Spokane. Spokane. It had to do with the parking meter resolution wherein its parking meter funds need to be earmarked to cover deficiencies in the cash flow. It had to do with their HUD rating vis-à-vis receiving HUD payments. It had to do with ongoing litigation with the developers. There were a myriad of factors that dictated a settlement perspective in the mind of the city. And this is what drove them to extinguish all of the bonds, separate and apart from the fact that there may have been a prosecution or a joint prosecution agreement, if you will. That really has nothing to do with what really could be recoverable from not only Prudential, but any other defendant. And while Prudential is being isolated out at the time of appeal here simply because we're the last party left, and incidentally it should be pointed out that Perkins Coie likewise was an alleged tortfeasor that was also in the case and was directly the subject of this same dismissal order. So the same procedures and considerations were being applied by the court, regardless of who the parties were. And when you get down to the very nub of it, it's axiomatic that a contribution plaintiff cannot recover more from a proportionately liable defendant than what was the reasonable settlement value that you paid a settlement, which is what triggered the contribution right in the first place. And that is what gets us to the 18.3 number that basically the two experts that were involved in this extended hearing on March 10th of 2004, they were in agreement within a matter of about $150,000 that the settlement value of the claims in the case was either between 18.1 or 18.3 million. And Judge Shea adopted the 18.1 was the number postulated by the Spokane expert, Gordon Yale. The 18.3 number was the one that was proffered by Dr. Clyden, the defendant's expert. And once the judge adopted that number, and I would commend you to read the transcripts, because the transcripts truly relate and show the thought process of the parties and the thought process of the judge. And that's starting with the transcript on January 4th of 05th, it's docket number 2283. And this was the hearing on January 4th at the very beginning of the year. And at that time in my argument, I introduced myself to Judge Shea and I said, the city can only recover as a maximum the value, the reasonable value of the contribution claim. And that is the heart of what we're talking about. The reasonable value of the contribution claim has to start at what amount of the settlement is attributable to the underlying damages involved in the case. I have two questions based on that, and they're different, so I'll put them both out there and you can figure out how best to deal with them. One is the mirror image of a question I posed to your colleague, which is, what authority is there to support the proposition that you've offered, that in fact the plaintiff is limited to the contribution value of the claims in the case? And the second question has to do with this chart behind tab two, which we were given, which I have to admit, I struggled for days to get it right. I had to work out all the numbers in this case in my head, and I'm easily confused, and so now I have a number that doesn't fit into my little head table. What is your response to the city's suggestion that this is the value of the claims being asserted in the litigation? So we shouldn't be at an $18 million figure. We should be at a $27 million figure. So those are the two queries that go down different lines, but I'm struggling with both of them. Thank you, Judge Clifton. The answer to the first, and I would direct the Court's attention to excerpt of record number 3399, and this is out of a brief that Prudential submitted to the Court on December 17th, 2004, regarding the – it's titled Prudential's submission read, Pre-trial and Trial Procedural Issues Requiring Court Consideration and Resolution. And in that, on the page I cited, I said, The Court's ruling on the motion to cap damages caps the city's potential contribution damages at a maximum of approximately $7 million. This is when we were dealing with negligent misrepresentation. South built homes v. Windermere Real Estate, South, 111 – or 118 Washington Appellate, 617, states, The one who seeks contribution may recover only the excess which he has paid over his share. Contribution is grounded in what is paid. And if you look at it from a reasonable analytical perspective, that case in that language makes exact sense, because I could have a $100 million claim, and if I set up a $7 million claim, I could settle it for $10 million. It doesn't mean that I can seek contribution for $100 million. Contribution is limited to the reasonable extent of the settlement. The second layer of authority is found in RCW 4.22.040.2. Contribution is available to a settlement with a claimant only, dot, dot, dot, B, to the extent that the amount paid in settlement was reasonable at the time of the settlement. Therein lies the limitation, both under case law, as well as statutory guidance. And again, the Port Reform Act, 4.22.040, is clearly a reasonable guidepost for a settlement with a claimant only, dot, dot, dot, B. The only portion of this settlement that can be reasonable vis-à-vis prudential in this case is the amount of the settlement that is attributable to the claims that were settled to which prudential was a viable defendant. And that's what takes us directly to the methodology and the calculations of Dr. Clyden. These are in the case, and it's those calculations viewed in the perspective of the law that I just cited that tells us why the 18.3 number is determinative rather than any higher potential damages amount. And for the record, if you look in terms of the record sites that we have, this is a portion of Dr. Clyden's declaration. It's excerpt of record, page 1403. It gives us the analysis at the very bottom of that page where it breaks out in categories the bonds that are in the case, determines the percentages of the bonds that are in the case, and then applies those percentages to the total amount of the city's settlement. And bottom line, you get at the very bottom of that page the 18,000, or 18.3 million amount that is the total dollar settlement amount attributable to the bonds in the case. And under the law that I just cited, that becomes the maximum threshold that the city can recover. Moving then to the next points that Ms. Siddeway has raised, while she has complained about Dr. Clyden in the briefing, it was actually the methodology of the city's expert that the court adopted in this instance, and Mr. Yale's methodology of the city's settlement. And Mr. Yale's... Is there any suggestion that they adopted anything from Mr. Clyden? The 18.3 million, as I said, was Dr. Clyden's number. If you compare it to excerpt of record, page 1456, Mr. Yale's number was 18,143,000. So they're... Those numbers weren't really... They really weren't in controversy. And so then... The methodology is the city expert. The methodology adopted was basically the city's expert, and so I can't really complain about that. Exactly. And when you get down to an offset amount as it relates to the reasonable value of the bonds, and since we're under a rescissionary remedy analysis here, the trial court adopted a number of 10.5 million. That was a mere $1.3 million greater than the outer range of what Mr. Yale computed the value of the bonds to be. Under the trial court's analysis, there is a cushion of more than $2 million that the city has in effect been overcompensated from the reasonable contribution recovery analysis that we're talking about here. And Ms. Sidway has characterized this as wrongfully attributing fault to the city. The analysis imposed by the court was not one of attributing fault. And I think the threshold point to make is, if you look in the record sites, it is beyond dispute, all of the parties agreed that Judge Shea was the person charged with determining the rescissionary definition of... Or rescissionary amount of damages. So no complaint can be made that Judge Shea was the person charged with determining the rescissionary definition of damages. And I think it's important to note that Judge Shea did this, and if you look at his report, or if you look at his opinion, Judge Shea has very clearly documented the fact that the reason he has added any value whatsoever to the 9.2 upper threshold of Mr. Yale was because the value attributed by Mr. Yale was in the context of the parking meter funds, regarding the myriad of efforts of the city to exculpate or relieve itself from the obligations of the Spokane City Ordinance as it related to the parking meter funds. And in light of those efforts, this is not an attribution of fault. Judge Shea viewed that as an... As external forces that had an impact on market. And therefore, Judge Shea was the person charged with determining the value of the parking meter funds. The decision that was made had to do with an assessment of market conditions, had nothing to do with attribution of fault to the city of Spokane. And again, the $1.3 million there even would make no difference in light of the cushion that existed vis-à-vis the amount that the city has in effect received in excess of the amount of the reasonable contribution of $1.3 million. In light of those final points, AGIC was raised. I've continued to think, always believed that AGIC has been a red herring here. The judge properly ruled that $774,000 was a maximum exposure related to AGIC. Anything above that, you can only have one stakeholder. It's either the bondholder or it's the insurer. If the bondholder has been made whole, there cannot be any potential liability as it relates to the insurer. And for that reason, there is absolutely no reason to look at the situation of AGIC as having any impact whatsoever on the ultimate result reached by the trial court. He properly resolved those issues. And this notion that somehow there was $14 million out there that still was a viable exposure is simply speculative. And it's not a matter of how you look at it. If you look, again, at the transcripts here, the city's own counsel, this is during the hearing on 310, excerpt of record 3665. So all I'm trying to do here is tell the court that was a real risk and that the city and the other defendants faced in 2004. And it's incredibly difficult to quantify it. It involves speculation and a lot of moving parts. Indeed, it was speculation and involved a lot of moving parts, because, again, as I say, the exposure or the amount of AGIC's damages had been ascertained at the $774,000. The court ruled that by way of a motion in limine ruling. The court reaffirmed that result in its ruling on September 30 or November 30 of 2004. And I'm going to bring this to a close, if you would. You're beyond a minute. Okay. Excerpt from record 1197. Finally, Your Honors, the city has raised the issue of reliance. We have put it in our papers. We put it in our briefing. When you look at the totality of Hines and Guarino and the other most recent case involving Prudential, Steiner, there's no issue that remains that reliance is an element of the law, and there is no need for you to address that aspect of the appeal. Thank you, Mr. Englund. Thank you very much. I don't know if I can add any clarity, but if I could ask you to take a look at the summary under tab two, I just want to explain these numbers and how they work. The $27 million figure was the plaintiff's expert's calculation of the rescissionary damage remedies only for the plaintiffs who were going to trial. We are not entitled to count plaintiffs who didn't have claims to go to trial. We didn't. This is the case that was going to go to trial if AGIC's recovery had not occurred. The reason we had the right-hand column is AGIC had threatened, it was apparent that it was going to, there would be additional interest payments missed in the future, and it had said, as those payments get missed, we're going to come back, you're going to have future exposure. So the second number was the additional exposure to AGIC. The city said to the plaintiffs, okay, you've got a claim that's worth $27 million and $41 million that you're ready to try against us. We're only going to pay you $29 million. They said okay. And what's critical, where the $18.3 million comes from is because they accepted only the $29 million and because the plaintiffs who were going to go to trial shared that with others, they got $29 million in settlement, but the part they kept of what they got was $18 million. The part they shared because they promised they would share it was the balance. And what Prudential is arguing, without any authority for it, is they get a windfall because the plaintiffs had this deal where the bond fund said, okay, we're going to take $9 million. The question I posed to you earlier was what authority is there for you to collect contribution for something that isn't in the lawsuit, which is that I take it the difference between the 33 and the 18. And you've given me a couple citations, and I'll go back and look at those again, but I think you still have the problem of trying to say that money that went to parties not in the lawsuit or for claims not in the lawsuit can support or can be collected from somebody else via contribution. And the only claim that wasn't in the lawsuit was AGIC's claim that we're going to incur costs in the future. There were no, we didn't pay, we didn't sell any bondholder claims that were not in the lawsuit. Thank you.
judges: McKeown, Clifton, Schwarzer